ORIGIN ID:BZSA    (202) 408-4600
ROBERT BRAUN, ESQ. C/O L. WILLIAMS

1100 NEW YORK AVE NW STE 500W
SUITE 500
WASHINGTON, DC 20005
UNITED STATES US

SHIP DATE: 12JAN21
ACTWGT: 4.00 LB
CAD: 252770019/INET4280

BILL SENDER

TO **ANGELA D. CAESAR, CLERK OF COURT**
**US DISTRICT COURT, WASHINGTON DC**
**333 CONSTITUTION AVENUE, N.W.**
**ROOM 1225**
**WASHINGTON DC 20001**
(202) 408-4600        REF 32090-001
INV:
PO:                                DEPT

56BJ1/1136/B766



FedEx.
Express

J202820071401uv

**WED - 13 JAN 10:30A**
**PRIORITY OVERNIGHT**

TRK#
0201    **7726 0434 9250**

**20001**
DC-US    **IAD**

**19 TSGA**



**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# COHENMILSTEIN

Robert A. Braun<br>
(202) 408-3657<br>
rbraun@cohenmilstein.com

January 12, 2021

Angela D. Caesar, Clerk of Court
U.S. District Court for the District of Columbia
333 Constitution Avenue NW
Room 1225
Washington, DC 20001

Re:    **NEW LAWSUIT TO BE FILED UNDER THE FALSE CLAIMS ACT**
            **31 U.S.C. § 3730(b)(1) AND (2), UNDER SEAL AND IN CAMERA**

Dear Ms. Caesar:

Enclosed please find a new case to be filed **IN CAMERA AND UNDER SEAL** pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(1) and (2). Enclosed are the following, in paper and electronic forms (via enclosed flash drive): (1) the Complaint, Motion to Seal the Action and Proposed Order; (2) a Civil Cover Sheet; (3) a Request Not to Issue A Summons; and (4) a copy of the cover of the Complaint, with an enclosed self-addressed stamped envelope. Also enclosed is a check for $402 payable to US District Court, District of Columbia.

Please date stamp the copy of the cover of the Complaint and return to me in the enclosed envelope.

Sincerely,

/s/ Robert A. Braun
Robert Braun

Enclosures

**COHEN MILSTEIN SELLERS & TOLL PLLC** · 1100 New York Ave. NW · Fifth Floor · Washington, DC 20005
T 202.408.4600 · cohenmilstein.com

# COHENMILSTEIN

**FILED UNDER SEAL**

ORIGINAL DOCUMENT PRINTED ON CHEMICAL REACTIVE PAPER WITH MICROPRINTED BORDER

**Cohen Milstein Sellers & Toll PLLC**
OPERATING ACCOUNT
1100 NEW YORK AVE., N.W
EAST TOWER, SUITE 500
WASHINGTON D.C., 20005-3934

EAGLEBANK
BETHESDA, MD 20814
65-329-550

106824

Date     December 2, 2020

Pay   Four hundred two and 00/100*************************************************     $   ***402.00***

Clerk, U.S. District Court

PAY
TO THE
ORDER OF

AUTHORIZED SIGNATURE

THIS DOCUMENT CONTAINS HEAT SENSITIVE INK. TOUCH OR PRESS HERE - RED IMAGE DISAPPEARS WITH HEAT

⑈106824⑈ ⑆055003298⑆     0200067445⑈

| Payee: | Clerk, U.S. District Court | | | | |
|---|---|---|---|---|---|
| Vendor ID: | 147 | | | Check #: | 106824 |
| | | | | Check Date: | Dec 02/20 |

| Invoice # | Invoice Date | Description | | Invoice Amount | Payment Amt |
|---|---|---|---|---|---|
| 20201201 | Dec 01/20 | CRINV Filing fee | | 402.00 | 402.00 |
| | | | Totals: | 402.00 | 402.00 |

## CIVIL COVER SHEET

JS-44 (Rev. 11/2020 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA, EX REL. TIMOTHY R. CARTER, | KBR, INC., AND KELLOGG, BROWN AND ROOT SERVICES, INC. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____ (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Houston, TX (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Robert A. Braun, Cohen Milstein Sellers & Toll PLLC, 1100 New York Ave. NW, Fifth Floor, Washington, DC 20005. Email: RBraun@cohenmilstein.com 202.408.4600 | |

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ● 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

**Social Security**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**● E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 27 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions
- ☐ 560 Civil Detainee – Conditions of Confinement

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent – Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016 (DTSA)

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**Other Statutes**
- ☐ 375 False Claims Act
- ☒ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 462 Naturalization Application

- ☐ 465 Other Immigration Actions
- ☐ 470 Racketeer Influenced & Corrupt Organization
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act (TCPA)
- ☐ 490 Cable/Satellite TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| | | | |
|---|---|---|---|
| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi-district Litigation  ○ 7 Appeal to District Judge from Mag. Judge  ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

The False Claims Act, 31 U.S.C. Sect. 3729 et seq.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** >1 million<br>**JURY DEMAND:** | Check **YES** only if demanded in complaint<br>YES ☒  NO ☐ |
|---|---|---|---|
| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐  NO ☒ | If yes, please complete related case form |

**DATE:** ___1/12/2021___  **SIGNATURE OF ATTORNEY OF RECORD** _____ /s/ Robert A. Braun _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of the case.

VI. CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES EX REL. CARTER, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>KBR, INC., KELLOGG BROWN & ROOT )<br>SERVICES, INC. )<br>)<br>Defendants. ) | Civil Action No.<br><br>Judge: |

## ORDER

AND NOW, this _____ day of _____, 2021, upon consideration of the Motion to Seal the Complaint and the Action, and to file the Complaint under seal, and upon review of The False Claims Act, 31 U.S.C. § 3730(b)(2), it is hereby ORDERED AND DECREED as follows:

1. The Complaint in this Matter, and the Motion to Seal, are filed under Seal; and

2. A seal shall remain on this Action until further Order of this Court.

BY THE COURT:

_____

The Hon. _____, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES EX REL.** [UNDER SEAL] | ) | **FILED IN CAMERA AND UNDER** |
| Plaintiffs, | ) | **SEAL PURSUANT TO** |
| | ) | **THE FALSE CLAIMS ACT** |
| v. | ) | **31 U.S.C. § 3730(b)(2)** |
| | ) | |
| [UNDER SEAL] | ) | **DO NOT ENTER IN PACER** |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| Defendants. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | **Civil Action No.** |

## RELATOR'S MOTION TO FILE COMPLAINT *IN CAMERA* AND TO PLACE

## COMPLAINT AND ALL OTHER PAPERS IN THIS MATTER UNDER SEAL

## PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. § 3730(b)(2)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES EX REL. TIMOTHY R. CARTER,<br><br>Plaintiffs,<br><br>v.<br><br>KBR, INC., AND KELLOGG, BROWN & ROOT SERVICES, INC.<br><br>Defendants. | ) **FILED IN CAMERA AND UNDER**<br>) **SEAL PURSUANT TO**<br>) **THE FALSE CLAIMS ACT**<br>) **31 U.S.C. § 3730(b)(2)**<br>)<br>) **DO NOT ENTER IN PACER**<br>) **DO NOT PLACE IN PRESS BOX**<br>) **JURY TRIAL DEMANDED**<br>)<br>) **Civil Action No.** |

## RELATOR'S MOTION TO FILE COMPLAINT *IN CAMERA* AND TO PLACE THE COMPLAINT, THE ACTION, AND ALL OTHER PAPERS IN THIS MATTER UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. § 3730(b)(2)

Proceeding in the name of the United States under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* Plaintiff Relator Timothy R. Carter, through his attorneys, hereby moves for an order authorizing him to file the Complaint and all other papers in this matter *in camera* and placing the Complaint and those papers under seal pursuant to 31 U.S.C. § 3730(b)(2). Section 3730(b)(2) of the federal False Claims Act provides that complaints in federal False Claims Act cases "shall be filed *in camera,* shall remain under seal for at least 60 days, and shall not be served on the defendant until the Court so orders." Plaintiff Relator Carter requests that the Complaint and all other papers in this matter be placed under seal until further order of this Court.

WHEREFORE, Plaintiff Relator Timothy R. respectfully requests this Court to grant this motion.

2

2808758 v1

3

Dated: January 12, 2021

Respectfully submitted,

*/s/ Robert A. Braun*

Robert A. Braun
D.C. Bar No. 1023352
1100 New York Ave. NW
Fifth Floor
Washington, D.C. 20005
202.408.4600
RBraun@cohenmilstein.com

Jeanne A. Markey
Gary L. Azorsky
Regina D. Poserina
*To Be Admitted Pro Hac Vice*
Cohen, Milstein, Sellers & Toll, PLLC
3 Logan Square, 1717 Arch Street, Ste 3610
Philadelphia, PA 19103
(267) 479-5700

Attorneys for Timothy R. Carter

3

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2021, I filed the Motion to Seal the Complaint and

Action with the Clerk of the Court, and the Complaint under the False Claims Act, using paper

and electronic means, and I sent notice via USPS, Certified Mail, return receipt requested, to the

following:

The Hon. Jeffrey A. Rosen
Acting Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

The Hon. Michael R. Sherwin
Acting United States Attorney for the
        District of Columbia
Office of the U.S. Attorney
555 4th Street, NW
Washington, DC 20530

Dated:    January 12, 2021                              /s/ Robert A. Braun
                                                        Robert A. Braun
                                                        Cohen Milstein Sellers & Toll PLLC
                                                        District of Columbia Attorney No.:
                                                        1100 New York Ave. NW
                                                        Fifth Floor
                                                        Washington, D.C. 20005
                                                        RBraun@cohenmilstein.com

4

2808758 v1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br>ex rel. Timothy R. Carter | )<br>)  ***FILED IN CAMERA AND UNDER***<br>)  ***SEAL***<br>) |
| Plaintiffs, | )<br>)  Civil Action No.<br>) |
| v. | )<br>)  Judge: |
| KBR, Inc.,<br>and Kellogg, Brown & Root Services, Inc., | )<br>)<br>) |
| Defendants. | )<br>) |

## REQUEST TO WITHHOLD ISSUANCE OF SUMMONS

To the Clerk of Court:

Herewith is a complaint filed under the False Claims Act, 31 U.S.C. § § 3729 et seq. The False Claims Act provides that complaints "shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." Accordingly, please withhold issuance of the summonses for this Complaint until further order of the Court.

Dated: January 12, 2021

Respectfully submitted,

/s/ Robert A. Braun

Robert A. Braun
D.C. Bar No. 1023352
1100 New York Ave. NW
Fifth Floor
Washington, D.C. 20005
202.408.4600
RBraun@cohenmilstein.com

Jeanne A. Markey
Gary L. Azorsky
Regina D. Poserina
*To Be Admitted Pro Hac Vice*
Cohen, Milstein, Sellers & Toll, PLLC
3 Logan Square, 1717 Arch Street, Ste 3610
Philadelphia, PA 19103
(267) 479-5700

Attorneys for Timothy R. Carter

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,** *ex rel.* **[UNDER SEAL],**<br><br>**Plaintiffs,**<br><br>v.<br><br>**[UNDER SEAL],**<br><br>**Defendants.** | **UNDER SEAL**<br><br>*Qui tam action filed in camera and under seal in accordance with 31 U.S.C. § 3730(b)(2)*<br><br><br>**Civil Action No.** |

**COMPLAINT**

Robert A. Braun
Cohen Milstein Sellers & Toll PLLC
D.C. Bar No. 1023352
1100 New York Ave. NW
Fifth Floor
Washington, DC 20005
202.408.4600
RBraun@cohenmilstein.com

Jeanne A. Markey
Gary L. Azorsky
Regina D. Poserina
*To Be Admitted Pro Hac Vice*
Cohen Milstein Sellers & Toll PLLC
3 Logan Square, 1717 Arch Street, Suite 3610
Philadelphia, PA 19103
(267) 479-5700
Attorneys for Plaintiff ex rel. Timothy R. Carter

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

------------------------------------- X

UNITED STATES OF AMERICA, EX REL.
TIMOTHY R. CARTER,

        Plaintiffs,

    -against-

KBR, Inc.
601 Jefferson Street, Suite 3400
Houston, TX 77002

        And

KELLOGG, BROWN & ROOT SERVICES,
INC.
1085 N. Eldridge Parkway
Houston, TX 77077

        Defendants.

------------------------------------- X

**FILED IN CAMERA AND UNDER SEAL
PURSUANT TO THE FALSE CLAIMS
ACT**

Case No.

## CIVIL COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ..................................................................................1

II.   JURISDICTION AND VENUE .............................................................................2

III.  PARTIES ...............................................................................................................2

IV.   LEGAL BASIS OF THE CASE..............................................................................3

    A.    The False Claims Act.................................................................................3

    B.    DOD Indefinite Delivery Indefinite Quantity Contracts ..........................4

V.    FACTUAL ALLEGATIONS OF FALSE CLAIMS.............................................10

    A.    KBR IDIQ CONTRACT, MODIFICATIONS, AND TASK ORDERS...............10

    B.    KBR FALIED TO REPORT KICKBACKS TO THE GOVERNMENT
        OCCURRING AT NSA AND ISA BAHRAIN. .....................................................14

    C.    KBR KNOWINGLY INFLATED INVOICES TO THE GOVERNMENT
        ON TASK ORDERS .......................................................................................15

VI.   FALSE CLAIMS ACT COUNTS .........................................................................24

    COUNT I ............................................................................................................24

    COUNT II............................................................................................................24

    COUNT III...........................................................................................................25

VII.  PRAYER FOR RELIEF ......................................................................................26

Relator Timothy R. Carter, by and through his attorneys, files this Complaint, in camera and under seal, for violations of the False Claims Act, 31 U.S.C. § 3729 et seq. These violations occurred due to Defendants KBR, Inc., and Kellogg, Brown & Root Services, Inc.'s (hereinafter, "the KBR Defendants" or "KBR") intentional and/or reckless submission of bids for contracted work with the Department of Defense (hereinafter, "DOD"), for the provision of services in the Kingdom of Bahrain (hereinafter, "Bahrain").

## I.   NATURE OF THE ACTION

1. This action seeks treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, based on fraud, false claims for payment, kickbacks, false statements made by, and payments made to Defendants KBR, Inc, and Kellogg, Brown & Root Services, Inc. in connection with the solicitation, proposal, negotiation, award, and activity under contracts with the DOD .

2. The KBR Defendants certified and submitted false or fraudulent certified cost and pricing data to the contracting officials for services to be performed at an American naval base in Bahrain, Naval Support Activity ("NSA") Bahrain, in their proposal for the provision of generalized base operations services. These false submissions were made in order to inflate the prices that the KBR Defendants could charge DOD for the goods and services covered by contract, and task orders stemming from the contract. In seeking payment under this fraudulently procured and falsely priced contract, and the similarly fraudulent task orders, the KBR Defendants submitted false claims to the United States and produced false documents and records which were material to those claims.

3. The submission of accurate pricing information in contracts, task orders, and

1

modifications is material to the United States' contracting and payment decisions. As a result of the KBR Defendants' false submissions, the United States paid the KBR Defendants monies they were not entitled to receive, resulting in damages to the United States.

## II.    JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1345.

5.    This Court has personal jurisdiction over the KBR Defendants because they reside in this district or have engaged in actionable conduct within this district.

6.    Venue is proper in this district pursuant to 28 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(2).

## III.    PARTIES

7.    The United States is the real party in interest to the claims in this action. The false claims in question were submitted to, and paid by, DOD, by and through its sub-agencies.

8.    Timothy R. Carter is an adult individual and U.S. citizen. Mr. Carter, a certified Project Management Professional ("PMP"), and Certified Management Accountant ("CMA"), was employed by defendant Kellogg, Brown & Root Services, Inc., as a Lead Cost Control Specialist on its contract with the DOD, and under task order with its sub-agency, the Department of the Navy, NSA Bahrain. As an employee of Kellogg, Brown & Root Services, Inc., Mr. Carter provided on-site cost and financial management support for a multi-year, $133 million U.S. Navy Base Operations Support (BOS) project; administered and maintained accounting and financial systems such as SAP and Deltek to track and report project budgets, commitments, expenditures, and cost reallocations; engaged in contract change management;

2

and prepared monthly estimate-to-complete forecasts, including all relevant direct and indirect cost components and resulting profit margins. Mr. Carter also reviewed cost estimates and related narratives in response to new DOD bid solicitations for contracted work on NSA Bahrain task orders, as well as for modifications to the existing firm fixed price ("FFP") contract award.

9.      Defendant KBR, Inc., is a global provider of professional services to, among others, the United States Government, with over 30 subsidiaries and joint ventures, and approximately 38,000 employees. Defendant KBR, Inc., is incorporated in the State of Delaware, with offices for the service of process at 601 Jefferson Street, Houston, TX 77002. Defendant Kellogg, Brown & Root Services, Inc., is a Delaware corporation, formed in May 2006, with offices for the service of process at 1085 N. Eldridge Parkway, Houston, TX 77077. Defendant Kellogg, Brown & Root Services, Inc., is a wholly owned subsidiary of defendant KBR, Inc. The KBR Defendants hold numerous contracts with the United States, including contracts which are indefinite delivery, indefinite quantity contracts.

## IV.   LEGAL BASIS OF THE CASE

### A.   The False Claims Act

10.     The False Claims Act establishes liability for any person who knowingly presents, or causes to be presented, to the United States, a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1)(A); and any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(B).

11.     The term "knowingly" under the False Claims Act means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth

3

or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required to show that a person acted knowingly under the False Claims Act. 31 U.S.C. § 3729(b)(1)(B).

12.   The term "material" or "materiality" is defined by the False Claims Act as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money." 31 U.S.C. § 3729(b)(4).  The term has been further defined and applied by courts, including by the United States Supreme Court, in *United States ex rel. Escobar v. United Health Services,* 136. S.Ct. 1989 (2016).  The Court defined "material" submissions as actionable claims because they contain "misrepresentations" "that state the truth only so far as it goes, while omitting critical qualifying information," (*Escobar*, 136 S.Ct. at 1994).  Courts analyzing whether submissions are material must "look[] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." (*Escobar*, 136 S.Ct. at 2002).  The False Claims Act provides for recovery of three times the damages sustained by the United States ("treble damages") plus a civil penalty for each false claim not less than $11,161 (beginning in June, 2018) and not more than $23,331.  31 U.S.C. § 3729(a); *see* 28 U.S.C. § 2461 (notes), 83 F.R. 3944 (January 29, 2018), and 85 F.R. 37004 (June 19, 2020).

**B.   DOD Indefinite Delivery Indefinite Quantity Contracts**

13.   The United States Government sometimes uses agreements known as indefinite delivery, indefinite quantity" ("IDIQ") contracts between itself and private companies in order to provide support for multiple government agencies, including the Department of Defense. IDIQ contracts permit a large number of government agencies to obtain professional services from the KBR Defendants using KBR as, in essence, a pre-authorized goods and services provider.  IDIQ contracts provide the general terms under which a contractor is permitted to work, but do not

4

delineate specific delivery or quantity conditions. 48 C.F.R. § 16.5. The government may use IDIQ contracts for recurring needs when it cannot determine, above a certain minimum, the quantity of supplies or services it will require over a particular period of time. 48 C.F.R. § 16-501-2. As the need for supplies or services is determined, the government can place task orders against an IDIQ contract for the needed goods and services up to a pre-determined limit, either measured in units for supplies or dollars for services. *Id.*

14.     Vendors placed on an IDIQ list of qualified vendors are not necessarily guaranteed to receive government sales or provide government services, but only entitled to compete with other qualified vendors for the sales and services at the subsequently requested configurations and volume. 48 C.F.R. §§ 16.504(a)-(c). With an IDIQ contract, the government is not contractually committed to buying a minimum quantity of goods from any awardee. 48 C.F.R. §§ 16.504(a), 501-1, 501-2(b)(2), 501-2(b)(3).

15.     When ordering supplies or services from an IDIQ vendor, the military issues a DD Form 1155 to be executed by the civilian contractor, in which the contractor expressly accepts "the terms and conditions" of the IDIQ contract and the numbered purchase or task order and "agrees to perform the same." The contract price is fixed at a level negotiated in the IDIQ contract. *See* https://www.acq.osd.mil/dpap/ccap/cc/jcchb/Files/FormsPubsRegs/DD1155.pdf.

16.     The process for awarding firm fixed price IDIQ contracts is aimed at negotiating a fair and reasonable price, not necessarily the lowest price. *See* Defense Federal Acquisition Regulation Supplement ("DFARS") 215.371-3. Individual orders under an IDIQ contract must clearly describe all services to be performed or supplies to be delivered so that the full cost or price for the performance of the work can be established when the order is placed. *See, e.g.,* DD 1155. Orders shall be within the scope of the contract and the order, issued within the contract's

5

period of performance ("PoP"), and within the maximum value of the contract. 48 C.F.R. §16.505 (a)(2).

17.     Each DOD contract and task order requires compliance with Federal Acquisition Regulations (FARs)[1] and the DFARS.  FAR 15.401 provides that the government is required to obtain a fair and reasonable price for the goods and services in question and expects its contractors to be truthful in providing a fair and reasonable price.  Pursuant to FAR 15.402, the government requires that "responsible sources shall provide fair and reasonable prices..." Contracting officers "shall obtain certified cost or pricing data when required…along with data other than certified cost or pricing data as necessary to establish a fair and reasonable price." *Id.* DFARS 215.371-3 requires that the contracting officer "shall obtain additional cost or pricing data to determine a fair and reasonable price. If the acquisition exceeds the certified cost or pricing data threshold and an exception to the requirement for certified cost or pricing data at FAR 15.403-1(b)(2) through (5) does not apply, the cost or pricing data shall be certified."

18.     The DFARS Procedures, Guides and Information (PGI) require, at PGI 215.402, Pricing policy:

(1) Contracting officers must purchase supplies and services from responsible sources at fair and reasonable prices. The Truth in Negotiations Act (TINA) (10 U.S.C. § 2306a and 41 U.S.C. chapter 35) requires offerors to submit certified cost or pricing data if a procurement exceeds the TINA threshold and none of the exceptions to certified cost or pricing data requirements applies. Under TINA, the contracting officer obtains accurate, complete, and current data from offerors to establish a fair and reasonable price (see FAR 15.403). TINA

---

[1] The Federal Acquisition Regulations (FAR) are contained at Title 48 of the Code of Federal Regulations ("C.F.R."). References to sections of 48 C.F.R. are also recognized as references to FAR sections.

6

also allows for a price adjustment remedy if it is later found that a contractor did not provide accurate, complete, and current data.

......

(3) Obtaining sufficient data from the offeror is particularly critical in situations where an item is determined to be a commercial item in accordance with FAR 2.101 and the contract is being awarded on a sole source basis. This includes commercial sales data of items sold in similar quantities and, if such data is insufficient, cost data to support the proposed price.

19.    The TINA requires offerors to certify that their cost and pricing data are current, accurate, and complete. TINA also provides rules dealing with defective pricing, including requiring a downward contract price adjustment, or permitting the government to recover overpayment of costs plus profit, plus interest on the overpayment. The penalty under TINA for knowing non-disclosures of cost and pricing data is double damages, that is, double the overpayment plus profit, plus interest.

20.    The FARs require that offerors in sole source basis situations must provide sufficient data related to the fairness and reasonableness of its costs, because the government requires, as a condition of contracting, that its offerors must deal honestly with the government. Honesty is material in a sole source request, because there is no price from a competitor(s) to serve as a basis for comparison.  FAR 2.101, Cost and Pricing Data, requires that, as of the date of the agreement between the parties, the offeror must include in its cost and pricing data all facts that prudent buyers and sellers would reasonably expect to significantly affect price negotiations. The data must be factual and verifiable. Data within the contractor's or a subcontractor's organization on matters significant to contractor management and to the government will be treated as reasonably available. What is significant depends upon the circumstances of each

7

acquisition. The contractor's responsibilities are not negated by a lack of personal knowledge.

*See* FAR 15.406.2. This section of the FAR also requires the contractor to sign a certification

stating as follows:

> This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in section 2.101 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.403-4) submitted, either actually or by specific identification in writing, to the Contracting Officer or to the Contracting Officer's representative in support of _____ * are accurate, complete, and current as of _____ **. This certification includes the cost or pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are part of the proposal.

FAR 15.406-2.

21.    The DFARS threshold, requiring certified cost and price data, for prime contracts

entered into before June 2018, is $750,000; and for contracts entered into after June 2018, is $2

million.  Section 811 of the National Defense Authorization Act for Fiscal Year 2018

(Pub.L.115-91) also increased the TINA threshold requiring certified pricing data from $750,000

to $2 million after June 2018, for all contracts subject to the FARs.  See, Exhibit A,

Memorandum, Class Deviation—Threshold for Obtaining Certified Cost or Pricing Data, Office

of the Under Secretary of Defense, April 13, 2018.

22.    Once a contract is entered into, the contracting officer or contracting officer's

representative for the applicable government agency creates a Price Negotiation Memorandum,

which records the negotiations, any exceptions to the proposed costs, and the extent of its

reliance on costs or pricing data. FAR 15.406-3.

23.    Defective pricing exists when the contractor fails to adequately disclose

its current, accurate and complete cost and pricing data ("information") as of the date of

agreement on price, and this failure causes an increase in the contract price. FAR 15.407-1.

Defective pricing is normally addressed by means of a contract remedy, but can rise to the level

of fraud if the contractor was aware of the defective information, failed to disclose this information to the government, and the government relied upon the defective information, causing an increase in the contract price. The burden is on the contractor to effectively disclose and identify the significance of its information to the government. FAR 15.408(b).

24. The "five points" which are examined when determining whether the pricing is defective are: (1) the information in question, the cost or pricing data; (2) the reasonable availability of the information to the contractor; (3) the appropriate disclosure of the information by the contractor to the government; (4) the government's reliance on the information; and (5) whether the government's reliance on the defective information caused an increase in the contract price.

25. If defective information is submitted, and the government relies upon it, a rebuttable presumption exists that the natural and probable consequence of the government's reliance would be an increase in the contract price. See, FAR 15.407. DOD contractors have an affirmative duty to report credible evidence of fraud. Failure to do so could result in debarment. FAR 3.1003(a)(2).

26. The Antikickback Act, 41 U.S.C. § 8702, prohibits any person from providing, or offering to provide, a kickback; or soliciting, accepting, or attempting to accept a kickback, related to the provision of government contracts. The law also prohibits a contractor or subcontractor from including the amount of the kickback in the contract price charged by the subcontractor to the contractor, or by the contractor to the government. Violations of 41 U.S.C § 8702 are actionable under the False Claims Act. *U.S. v. Gen. Dynamics Corp.*, 19 F. 3d 770, 775 (2d Cir. 1994); *Kellogg, Brown & Root Servs. v. United States*, 99 Fed. Cl. 488, 507 (Ct. Cl.

9

2011). Employers are liable for the actions of their employees that violate the Act. 41 U.S.C. § 8706(a)(2).

27. A government contractor is required to "have in place and follow reasonable procedures designed to prevent and detect [improper kickbacks] in its own operations and direct business relationships." 41 U.S.C. § 8703( c). Once having "reasonable grounds to believe" that a kickback "may have occurred," the prime contractor or subcontractor must "promptly report the possible violation in writing to the inspector general of the contracting agency… or the Attorney General." Id.

28. Contractors are required to fully cooperate with a government investigation of a possible kickback. 41 U.S.C. § 8703 (b). Government investigation of a possible kickback requires that contractors provide access to the contractors' facilities and permit government investigators to "audit the books and records, including electronic data or records…" 41 U.S.C. § 8704(a).

## V.   FACTUAL ALLEGATIONS OF FALSE CLAIMS.

### A.   KBR IDIQ CONTRACT, MODIFICATIONS, AND TASK ORDERS

29. The KBR Defendants entered into two contracts with the DOD for work in Bahrain (collectively, "the Bahrain Contracts"). First, the KBR Defendants entered into a firm fixed price contract, with an estimated IDIQ award amount, with the DOD, Naval Facility Engineering System Command, Atlantic, located in Norfolk, VA, in approximately May 23, 2017, for a five year period with a one year extension, at a potential value of $133,183,283.00, for services to be performed at NSA Bahrain (the "NSA Contract"). The contract procurement code was N6247017D4007; the NAICS Code was 561210; the Product Service Code was S216. The contract was funded by the Department of the Navy, Navy Installations Command,

10

Washington, D.C. The NSA Contract was for Base Operations Support (BOS) Services to be performed at NSA Base, Bahrain. NSA Bahrain is a Naval Systems Activity (NSA) base that houses the U.S. Naval Central Command.

30. The NSA contract, when bid, required KBR to submit certified cost and pricing data. The services to be performed included all base activities, such as base security (augmenting the security provided by military personnel), dining hall operations and maintenance, housekeeping and cleaning services, landscaping, environmental services, water plant services, plumbing, electrical maintenance, HVAC maintenance, and general maintenance.

31. KBR also entered into a separate five-year contract, with a one year add on, at ISA Bahrain (the "ISA Contract"). ISA Bahrain is a Bahraini air base with US forces also present, located approximately one hour from NSA Bahrain. The ISA Contract with KBR was for BOS services at ISA Bahrain, with a contract value of up to approximately $80 million, and administered by some of the same personnel as those located at NSA Bahrain.

32. As of June 2018, KBR had civilian employees in Bahrain performing services and providing goods under these contracts, task orders, and modifications to the contracts including:

    a. Roger Singleton, a KBR Director located in Houston, TX, and the Executive Manager of the NSA and ISA project teams. Singleton had formerly worked in Bahrain and visited there during relator Carter's employment. He was terminated by KBR in December 2018, allegedly for receiving kickbacks from subcontractors.

    b. Richard Westcott, ISA Base Project Controller, subsequently promoted to NSA Team Lead in the Spring of 2019. Mr. Westcott was terminated for alleged

financial transaction improprieties related to receiving an unauthorized housing allowance.

    c.   Dale Knutson, KBR Project General Manager at ISA and NSA.

    d.   Steve Palmer, ISA Project Team Lead.

    e.   Ward Larson, NSA Project Team Lead. He was terminated in October 2018and replaced on an interim basis by Dale Knutson.

    f.   William "Glen" Pelham, ISA Team Lead, then NSA Team Lead, after Larson was terminated. He was terminated in January 2019, allegedly for a drunk driving arrest.

    g.   Aleisha Harris, KBR Subcontracts Administrator at ISA and NSA. She was transferred from NSA Bahrain, and returned to KBR, Houston.

    h.   Molly Bach, project manager at NSA, beginning in the Spring of 2019, where she remains employed.

33.    Relator Carter was the Lead Cost Control Specialist at NSA from June 2018 to August 2019. In this job, Mr. Carter was responsible for performing a range of financial management tasks arising from KBR's provision of contracted goods and services at NSA Bahrain. These tasks included providing on-site cost and financial management support, administering and maintaining accounting and financial systems such as SAP and Deltek to track and report on projected versus actual costs, financial commitments and expenditures, and cost accounting related to contract change management; and preparing monthly estimate-to-complete forecasts, including all relevant direct and indirect cost components and resulting profit margins.

34.    In the course of executing his responsibilities, Mr. Carter became aware

that KBR was losing money in its performance under the IDIQ contract in Bahrain. On the NSA projects alone, Mr. Carter personally observed that KBR was losing about $200,000 per month under the NSA Contract. These significant losses, Mr. Carter observed, were due to the fact that KBR had underbid the NSA Contract. Moreover, it appeared to Mr. Carter that KBR had underbid in order to increase its chances of being awarded the contract. Specifically, Mr. Carter concluded, KBR had underbid its costs of supplying security personnel at NSA.

35. KBR subcontracted the security personnel from a Bahrain-based company called JOZ. Relator Carter's belief that the KBR Defendants had underbid the contract, and as a result had security cost overruns, stems from the fact that the KBR Defendants had full knowledge of the number of personnel required to perform security services at NSA Bahrain, the number of man hours needed to augment DOD's security manpower, and the labor rates to be paid to these security personnel. Furthermore, the KBR Defendants had previous experience bidding on subcontracted security services and doing so again in this case should have been very straightforward. There was no ambiguity to this work, and few unknowns as is sometimes true with other components of contracts such as NSA Bahrain. Nevertheless, KBR underbid this contract, with knowledge that KBR's underbid could well increase its chances of being awarded the contract. KBRs' bid was significantly lower than the incumbent contractor, but KBR went forward on this low bid, thereby providing itself with the opportunity to win the work and then "make up its losses" on the IDIQ through task orders and modifications.

36. As of November 2018, KBR had lost at least $1.4 million on the NSA Contract. Relator Carter was receiving blame and hostility from KBR's management in Houston for the losses and general project management chaos despite the fact that he had only worked on the project since late June 2018, and he had played no role whatsoever in underbidding the

contract. KBR executive management who regularly attended online and telephonic meetings with the NSA Project Management team, including Mr. Carter, and to whom Mr. Carter, during the monthly briefing meetings, reported the project budget and actual costs and other key performance indicators including profitability, include but are not limited to Ella Studer, Senior Vice President, Government Solutions U.S.-Logistics (Arlington, VA); Robert Nicholson, Vice President of Operations (Houston, TX); and Stuart White, Senior Director of Accounting and Finance (Houston, TX).

## B. KBR FALIED TO REPORT KICKBACKS TO THE GOVERNMENT OCCURRING AT NSA AND ISA BAHRAIN.

37.    In October 2018, Mr. Carter became aware, from conversations with Aiesha Harris, KBR subcontract administrator for the Bahrain Contracts, that KBR employee Roger Singleton was accepting kickbacks from subcontractors that were seeking to obtain work through KBR at ISA and NSA Bahrain. At least two subcontractors, Belmark and TransAtlantic Group, paid Singleton kickbacks in cash and other things of value, including expensive cars and apartments, for the opportunity to do business with KBR under the Bahrain Contracts.

38.    To the best of Mr. Carter's knowledge, information and belief, KBR never revealed to DOD that its subcontractors paid kickbacks in order to obtain work through KBR on the Bahrain Contracts and associated task orders. Mr. Carter holds this belief because, in his role as the Lead Cost Control Specialist at NSA Bahrain, he would have been aware if DOD investigated the kickbacks, audited the program, or performed any type of investigation of the contracts. In mid-December 2018, KBR did fire Singleton as a result of its investigation into these activities. However, KBR never reported the kickbacks, or the firing, to the government, as

14

required by 41 U.S.C. § 8703, because, upon information and belief, reporting such information would have permitted the United States to audit and review all of the KBR defendants' records, including the financial records related to the NSA task orders.

39. KBR's failure to inform DOD that kickbacks had been paid by subcontractors to KBR personnel to secure contracts is a violation of the False Claims Act, and 41 U.S.C. §8701 *et seq.*, which specifically require the contractor to report kickbacks to the government, and to permit and cooperate with a government investigation. It is material to the government's payment decision that its contractors do not participate in kickbacks. It is also material to the government that it be notified of the contractor's discovery of kickbacks by its employees or subcontractors so that the government can ensure it is not paying for claims tainted by kickbacks.

## C. KBR KNOWINGLY INFLATED INVOICES TO THE GOVERNMENT ON TASK ORDERS

40. In late September 2018, Westcott, Knudson, Pelham, and Mr. Carter met to begin working on a bid to respond to a Request for Quotation (RFQ), which was initially referred to as contract modification No. 8. The contract modification was eventually cancelled by the NSA contracting office and replaced with two task order proposals, Task Orders 41 (F4026) and 42 (F4027). Westcott prepared the responses and submitted the proposal to NSA BOS Contracting Officer Leigh Walker in approximately November 2018. KBR was the sole source presented with the opportunity to submit a proposal for the work contained in these task orders. These task orders were for comprehensive base operations and maintenance services at NSA Bahrain.

41. DOD entered into a sole source Task Order (#41/ N3319119F4026) with KBR in November 2018 with three, one-month work periods of performance ("PoP") commencing in December 2018 and lasting until February 2019. DOD entered into a sole source Task Order

15

#42/ N331911F4027 with KBR in November, 2018, with three, one-month PoPs also commencing in December 2018 and lasting until February 2019. The total dollar amount of the two task orders was $1.8 million, with one third paid each month.

42.    Task Orders 41/4026 and 42/4027 were required to be bid with certified cost and price data, which included a written affirmation that the submitted certified price and cost data was true, accurate, and correct, to the best of the contractor's knowledge, for the goods and services related to the underlying IDIQ contract. KBR had bid the Task Orders with a seven percent (7%) profit margin which was reflected in the Task Orders. The scope of work was extended three times, each with three-month PoPs, first from March to May 2019, then from May to August 2019, and finally from August to November 2019. Similarly, the dollar value of the two task orders was correspondingly increased as a result of each extension.

43.    As the Task Orders were ending in February 2019, the NSA Contracting Office, unaware of any defective pricing issues, awarded KBR a $1.8 million, 3-month extension of Task Orders 41 and 42, to cover March 2019 through May 2019. The total awarded contract value for Task Orders 41 and 42 was now $3.6 million. The extension from June 2019 through August 2019, also increased the total award contract value for Task Orders 41 and 42 another $1.8 million, for a total of $5.4 million. Upon information and belief, the NSA contracting office, still unaware of any defective pricing issues, awarded KBR another $1.8 million, three-month extension of Task Orders 41 and 42 to cover September 2019 through November 2019, for a total award contract value for Task Orders 41 and 42 of $7.2 million. As of November 30, 2019, the total obligated amount was approximately $8.1 million.

44.    By February 2019, Mr. Carter realized that KBR's performance on the Task

16

Orders was generating a profit for KBR which was far greater than what KBR had represented to DOD. Mr. Carter had determined that actual costs under Task Orders 41 and 42 were significantly lower than those contained in the task order bid proposals to NSA. Indeed, it appeared that the task order cost and pricing proposals contained defective pricing.

45. Upon further examination of the cost proposals, Mr. Carter noticed improprieties, including that Richard Westcott had included in the proposal a housing allowance for himself in support of NSA, despite the fact that he was assigned to ISA. Mr. Carter reported his observations regarding Westcott's charging the NSA Task Order for his housing allowance to the KBR Ethics and Human Resources departments.

46. Mr. Carter also realized, upon examination of KBR's invoices and task orders, that the invoices submitted to the government for the task orders were inflated. KBR was submitting invoices for payment, claiming that it had performed services and procured equipment, material and supplies that had not cost KBR anywhere near what it was charging the government. In fact, KBR had performed the work the Task Orders anticipated and permitted, but performance had cost KBR significantly less, with respect to both goods and services, than KBR had initially proposed and ultimately charged. For instance, KBR had proposed a number of man-hours to perform tasks that expressly contemplated the hiring of additional employees, but, in truth, knew at the time of the proposal that it would be able to perform the tasks with its existing staff, thus saving itself the costs of hiring and training new employees.

47. These actions amounted to defective pricing by the KBR Defendants because accurate, certified cost and pricing data information was available to the KBR Defendants, but the KBR Defendants knowingly failed to appropriately disclose accurate cost and pricing information to the government. The government relied in good faith upon the inaccurate

17

information KBR knowingly supplied in connection with the Task Order. As a consequence of KBR's fraudulent conduct, and over the entire one-year term of the Task Orders, the government paid amounts which had been falsely inflated.

48. Indeed, KBR billed the Navy monthly for the full amount of goods and services proposed and provided for in the Task Orders, but not for the actual costs of the work performed or the actual costs of goods acquired and used. Instead, KBR billed the Navy monthly based on the knowingly defective cost and price data information.

49. As of July 2019, KBR had billed for 67% of both Task Orders, but its actual operating costs to date, including overhead and general administrative costs, were dramatically lower. Performance at that point had only cost KBR 7% of Task Order 41's proposed costs and income, and 32% of Task Order 42's proposed costs and income.

50. The Task Orders were knowingly written with defective pricing in reckless disregard of KBR's obligations to provide accurate costs and pricing data under FAR, DFARS and TINA. For instance, KBR employees, including but not limited to Dale Knutson and Richard Westcott, knowingly proposed to DOD (a proposal DOD accepted in good faith) a scope of work including labor which in truth KBR had no intention of hiring or providing, and which, in fact, it did not hire or provide. Likewise, KBR, by and through its employees, knowingly failed to purchase materials and equipment it falsely represented to DOD were essential to the proposal and which DOD in good faith accepted as such in entering into the Task Orders. Instead, KBR only purchased that subset of materials and equipment that they could not avoid purchasing, and otherwise used materials and equipment already on hand. Nevertheless, KBR falsely charged DOD for all the materials and equipment included within the Task Orders – even though many had never been purchased.

18

51.    In order for the KBR Defendants to be paid under the Task Orders, the following occurred monthly at KBR:

a.    KBR had to complete the tasks or requirements related to the goods and services required by the Task Orders;

b.    Just after the first of each month, KBR's contracting manager and quality control manager confirmed that the tasks/requirements under the Task Order had been completed, and obtained authority and sign-off from the client/Navy/DOD, to create and submit the invoice;

c.    KBR's headquarters invoicing team was notified of the need to create an invoice for the work performed, and did in fact create an invoice based on the defective pricing;

d.    The task order invoices, which contained the defective pricing but were general in nature and did not break out specific tasks performed or goods provided, were sent to Mr. Carter, who reviewed the invoices for accounting accuracy and then sent them to Dale Knudson or Molly Bach, who signed the invoices on behalf of KBR. These invoices contained attestations, above the signature line, as required by the FARs and DFARS, that the submissions were truthful and accurate, and that the signer is certifying that the cost and pricing data incorporated in the invoices are accurate, complete and current. *See* FARs 15.406-2,

e.    Mr. Carter then scanned and uploaded the invoices to KBR's computer system; and

f.    The invoices were submitted to the United States' Contracting Officer, Leigh Walker, on behalf of the Naval Facilities Engineering Command, on behalf of the government, for payment, on the 4th or 5th day of each month.

19

This process occurred each month, from July 2018, through August 2019, and, upon information and belief, continued to occur in this fashion after Mr. Carter left NSA Bahrain. The process occurred during the first four days of each month, with final submission to the United States occurring by the fourth or fifth day of each month.

52.   Each of these invoices submitted to the government contained defective price and cost data based on the KBR Defendants' defective certified cost and pricing data.

53.   KBR inflated the NSA Dining Facility Administration Center ("DFAC") proposal, which was a separate task order that preceded Task Orders 41 and 42, and was awarded in approximately July 2018 and ended on November 30, 2018, with a contract amount of approximately $685,000  The DFAC Task Order proposal included the costs for some consumable supplies and other items that the United States had already paid KBR to purchase on the ISA Bahrain base.  KBR had these items in storage at ISA Bahrain and simply transported them to NSA Bahrain for the DFAC performance.  Despite this planned use of previously purchased and paid-for supplies, KBR unlawfully charged the government for these supplies a second time.

54.   Westcott directed trades supervisors to source equipment and supplies from vendor price lists, then add a 25% to 50% markup, fully aware that the contracts and task orders only permitted a six to eight percent profit on supplies.  Mr. Carter became aware, during the course of performing his job duties, of these inflated, defective pricing proposals when he reviewed and coded Material Requisition ("MR") forms.  The MRs are standard order forms submitted by KBR trades supervisors who are performing services provided for in the Task Orders or the Firm Fixed Price (FFP) contract.  MRs list equipment and/or supply items, the

20

quantity needed, the price per item, and the department requesting the items. The prices per item were incorporated into the Task Order proposals when submitted. A significant number of MRs reviewed by Mr. Carter showed that the Task Order prices and costs, some of which were taken from the proposal, had been falsely inflated by a minimum of 25%, making the cost and pricing data materially defective.

55. By the beginning of June 2019, KBR had invoiced the government for the entire $3.6 million on Task Orders 41 and 42 for the PoP between December 2018 to May 2019. These invoices and submissions included all proposed costs for goods and services. The government paid KBR the entire amounts invoiced for this PoP, unaware that KBR had not incurred the costs for goods and services for which it was invoicing the government, and that it had in fact submitted defective cost and pricing data as part of its proposals.

56. Mr. Carter prepared and presented the financial results of performance under Task Orders 41 and 42 to the KBR Executive Leadership team in the U.S. KBR was fully aware of the inflated profit it was obtaining as a result of Task Orders 41 and 42. By late June 2019, based on financial data available to Mr. Carter showing direct and indirect costs, commitments, expenditures and profit, KBR was predicting its profit on Task Orders 41 and 42, for the period ending August 2019, at $4 million. Such an enormous profit was fraudulent on its face, resulted from the defective cost and pricing data, and bore no relationship to the far smaller, and far more reasonable, profit that the government believed was provided for under the Task Orders as KBR had presented them.

57. Company documents show that KBR knowingly continued to overbill NSA Bahrain for goods and services under Task Order 41. In January 2019, Mr. Carter created a spreadsheet for KBR management called the NSA BOSS Bahrain- IDIQ Tracker that revealed

just how inflated the cost and pricing data KBR submitted to the government was and how enormous its profit margin on Task Order 41 was as a direct consequence. The KBR Defendants had budgeted the costs of Task Order 41, from December 1, 2018, through July 31, 2019, including overhead, general administration and profit, to be $2,114,563, with budgeted income of $156,280, for a total budget revenue of $2,270,843. Budgeted profit was anticipated to be 6.9%. KBR's actual operating costs to date were $155,679, with an estimate to complete the Task Order—which only had one month left—of $157,453. KBR's anticipated operating income from Task Order 41 was forecast to be $1,957,711, with an extraordinary 86.2% profit margin.

58.    The numbers tell the story with respect to Task Order 42 as well. This same spreadsheet showed Task Order 42 as having a budgeted cost, including overhead, general administration and profit, of $3,015,681, with budget income of $222,879, for a total budget revenue of $3,238,560. Budgeted profit on the Task Order was anticipated at 6.9%. KBR's actual operating costs on Task Order 42, as of late July 2019, were $969,770, with an estimate to complete the Task Order—which only had one month left—of $552,400. KBR's anticipated operating income from Task Order 42 was forecast to be $1,716,390, showing a similarly outsized 53.09% profit margin. Task Order 42 was also the result of the KBR Defendants' defective cost and pricing data submissions.

59.    As of June 1, 2019, the total anticipated operating income, or profit, from Task Orders 41 and 42 was anticipated to be $3,674,101, or a combined total of 66.7% of the $5,509,403 total Task Order budget revenues. These outrageously large profits were the direct result of the KBR Defendants' knowingly defective cost and pricing data submissions.

60.    KBR built extra monies into its internal budget to be prepared in the event there

22

were cost overruns or unexpected expenditures. For the two task orders, KBR budgeted $300,000 for its "contingency fund," to cover unexpected costs of goods and services that had not been reflected in the proposal. By the end of July 2019, KBR had only spent $40,000 of its contingency fund, leaving $260,000 in the contingency fund as of August 1, 2019. At that point, only one month was left in the then-existing PoP under the Task Order extensions. That contingency fund was accounted for in KBR's estimate to complete, but not accounted for in its final operating income. Adding the contingency fund to its final accounting, KBR anticipated making an additional $260,000, or 71.4% in profit from the total Task Order budget revenue.

61.   In the July 2019 IDIQ Tracker, KBR also included the amounts it had proposed to outlay, in goods and services, in order to complete the Task Orders. However, as discussed above, KBR's cost proposals (which had been incorporated into the Task Orders) were materially inflated, and the result of knowingly defective cost and pricing data, as KBR knew it would not incur the costs in time and materials that it had certified it would incur. On approximately the fourth of each month, KBR submitted invoices to the government for the full monthly amount, regardless of the fact that it had not incurred the costs related to the goods and services invoiced.

62.   Fully aware that it was violating the federal requirement to deal honestly and fairly with the United States by overcharging for services and supplies and by submitting knowingly defective cost and pricing data, KBR continued to submit inflated false claims for payment each month from at least July 2018 through November 2019. The government specifically requires that its contractors deal fairly and honestly with the government, including by its provision of certified costs and pricing data. It is material to the government's payment decision that it only pays for goods and services that were actually provided.

23

63.    The United States, by and through the Department of the Navy, Naval Facilities Engineering Command, paid KBR monthly in the amounts invoiced on its inflated, false submissions.

64.    Each and every claim submission for payment related to Task Orders 41 and 42, from December 2018 through November 2019, was false.  As a result of these false claims, the United States paid KBR and was damaged.

## VI.    FALSE CLAIMS ACT COUNTS

### COUNT I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

65.    Relator re-alleges and incorporates each allegation in each of the preceding paragraphs as if fully set forth herein and further alleges as follows.

66.    By virtue of the acts described above, Defendants "knowingly present[ed], or cause[d] to be presented, false or fraudulent claims for payment or approval" in violation of 31 U.S.C. § 3729(a)(1)(A).

67.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

### COUNT II
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

68.    Relator re-alleges and incorporates each allegation in each of the preceding paragraphs as if fully set forth herein and further alleges as follows:

24

69.    By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement that was material to false or fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B).

70.    Such false records or statements include, for example, the failure to report, pursuant to 41 U.S.C. § 8702 et seq., the KBR Defendants' employees' participation in kickbacks with subcontractors. The bids for the Task Orders are also false records and statements material to a false claim, as the knowingly defective cost and pricing data was material to the government's payment decision.

71.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**COUNT III**
**The Federal False Claims Act**
**31 U.S.C. § 3729 (a)(1)(G)**

72.    Relator re--alleges and incorporates each allegation in preceding paragraphs as if fully set forth herein and further alleges as follows.

73.    By virtue of the actions described above, Defendants have "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the government."

74.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

25

## VII.    PRAYER FOR RELIEF

**WHEREFORE,** Relator Timothy R. Carter demands that judgment be entered in favor of the United States and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes three times the amount of damages to the United States plus civil penalties of no more than $23,331 and no less than $11,665 for each false claim submitted to the United States, and any other recoveries or relief provided for under the FCA.

Further, Relator Carter requests that he receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator Carter requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: January 12, 2021

Respectfully submitted,

*/s/ Robert A. Braun*

Robert A. Braun
D.C. Bar No. 1023352
1100 New York Ave. NW
Fifth Floor
Washington, D.C. 20005
202.408.4600
RBraun@cohenmilstein.com

26

Jeanne A. Markey
Gary L. Azorsky
Regina D. Poserina
*To Be Admitted Pro Hac Vice*
Cohen, Milstein, Sellers & Toll, PLLC
3 Logan Square, 1717 Arch Street, Ste 3610
Philadelphia, PA 19103
(267) 479-5700

Attorneys for Timothy R. Carter

27

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2021, I filed, via the court's sealing procedures, a true and correct copy of the within complaint, motion to seal the complaint and supporting documents, with the Clerk of the court, and in turn sent notice to the following via certified mail, return receipt requested:

The Hon. Jeffrey Rosen
Acting United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

The Hon. Michael R. Sherwin
Acting United States Attorney
for the District of Columbia
555 4th St NW
Washington, DC 20530

/s/Robert A. Braun
Robert A. Braun
Cohen Milstein Sellers & Toll PLLC
D.C. Bar No. 1023352
1100 New York Ave. NW
Fifth Floor
Washington, D.C. 20005
202.408.4600
RBraun@cohenmilstein.com

Jeanne A. Markey
Gary L. Azorsky
Regina D. Poserina
*To Be Admitted Pro Hac Vice*
Cohen, Milstein, Sellers & Toll, PLLC
3 Logan Square, 1717 Arch Street, Suite 3610
Philadelphia, PA 19103
(267) 479-5700

Attorneys for Timothy R. Carter

28

# U.S. EX REL. CARTER

# U.S. DISTRICT COURT

# DISTRICT OF COLUMBIA

# EXHIBIT A



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
**3000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3000**

APR 1 3 2018

**ACQUISITION
AND SUSTAINMENT**

In reply refer to
DARS Tracking Number:  2018-O0012

MEMORANDUM FOR COMMANDER, UNITED STATES SPECIAL OPERATIONS
COMMAND (ATTN:  ACQUISITION EXECUTIVE)
COMMANDER, UNITED STATES TRANSPORTATION
COMMAND (ATTN:  ACQUISITION EXECUTIVE)
DEPUTY ASSISTANT SECRETARY OF THE ARMY
(PROCUREMENT)
DEPUTY ASSISTANT SECRETARY OF THE NAVY
(ACQUISITION AND PROCUREMENT)
DEPUTY ASSISTANT SECRETARY OF THE AIR FORCE
(CONTRACTING)
DIRECTORS OF THE DEFENSE AGENCIES
DIRECTORS OF THE DOD FIELD ACTIVITIES

SUBJECT:  Class Deviation—Threshold for Obtaining Certified Cost or Pricing Data

Effective July 1, 2018, contracting officers shall use $2 million as the threshold for obtaining certified cost or pricing data, in lieu of the threshold of $750,000 at Federal Acquisition Regulations (FAR) 15.403-4.  In addition, contracting officers shall use the provision and clauses provided in Attachment 1 of this deviation in lieu of FAR clauses 52.230-1 through 52.230-5.

Section 811 of the National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2018 (Pub. L. 115-91) increases the threshold for obtaining certified cost or pricing data under 10 U.S.C. 2306a (frequently referred to as "Truth in Negotiations Act") and 41 U.S.C. 3502 from $750,000 to $2,000,000 for contracts entered into after June 30, 2018.  Since 41 U.S.C. 1502(b)(1)(B) equates the cost accounting standards threshold to the threshold for obtaining certified cost or pricing data at 10 U.S.C. 2306a, this class deviation also increases the threshold for applicability of the cost accounting standards to $2 million.

This class deviation remains in effect until it is incorporated into the FAR, or otherwise rescinded.  My point of contact is Mr. Mark Gomersall, who is available at 571-372-6099, or at mark.r.gomersall.civ@mail.mil.

Shay D. Assad,
Director, Defense Pricing/Defense
Procurement and Acquisition Policy

Attachment:
As stated

Attachment 1
Class Deviation 2018-O0012
Threshold for Obtaining Certified Cost and Pricing Data
*Changes to the provision and clauses are indicated by a change bar in the right-hand margin.*

### 52.230-1 Cost Accounting Standards Notices and Certification (Deviation 2018-O0012).

Insert the following provision, in lieu of the provision at FAR 52.230-1, Cost Accounting Standards Notices and Certification, in solicitations for proposed contracts subject to CAS as specified in 48 CFR 9903.201 (FAR Appendix).

COST ACCOUNTING STANDARDS NOTICES AND CERTIFICATION (DEVIATION 2018-O0012)
(APR 2018)

Note: This notice does not apply to small businesses or foreign governments. This notice is in three parts, identified by Roman numerals I through III.

Offerors shall examine each part and provide the requested information in order to determine Cost Accounting Standards (CAS) requirements applicable to any resultant contract.

If the offeror is an educational institution, Part II does not apply unless the contemplated contract will be subject to full or modified CAS coverage pursuant to 48 CFR 9903.201-2(c)(5) or 9903.201-2(c)(6), respectively.

I. DISCLOSURE STATEMENT—COST ACCOUNTING PRACTICES AND CERTIFICATION

(a) Any contract in excess of $2 million resulting from this solicitation will be subject to the requirements of the Cost Accounting Standards Board (48 CFR Chapter 99), except for those contracts which are exempt as specified in 48 CFR 9903.201-1.

(b) Any offeror submitting a proposal which, if accepted, will result in a contract subject to the requirements of 48 CFR Chapter 99 must, as a condition of contracting, submit a Disclosure Statement as required by 48 CFR 9903.202. When required, the Disclosure Statement must be submitted as a part of the offeror's proposal under this solicitation unless the offeror has already submitted a Disclosure Statement disclosing the practices used in connection with the pricing of this proposal. If an applicable Disclosure Statement has already been submitted, the offeror may satisfy the requirement for submission by providing the information requested in paragraph (c) of Part I of this provision.

Caution: In the absence of specific regulations or agreement, a practice disclosed in a Disclosure Statement shall not, by virtue of such disclosure, be deemed to be a proper, approved, or agreed-to practice for pricing proposals or accumulating and reporting contract performance cost data.

(c) Check the appropriate box below:

Page 1 of 12

COHENMILSTEIN

# Flash Drive

ORIGIN ID:TSGA      (202) 408-4600
ANGELA D. CAESAR, CLERK OF COURT
US DISTRICT COURT, WASHINGTON DC
333 CONSTITUTION AVENUE, N.W.
ROOM 1225
WASHINGTON, DC 20001
UNITED STATES US

SHIP DATE: 12JAN21
ACTWGT: 4.00 LB
CAD: 252770019/INET4280

TO **ROBERT BRAUN, ESQ. C/O L. WILLIAMS**

**1100 NEW YORK AVE NW STE 500W**

**SUITE 500**

**WASHINGTON DC 20005**

(202) 408-4600          REF: 32090-001
INV
PO                          DEPT

RMA:




FedEx
Express

56BJ1/1136/B766

**RETURNS MON-FRI**

**PRIORITY OVERNIGHT**

TRK#
0221  **7911 1930 7740**

**20005**

DC-US



1. Select the 'Print' button to print 1 copy of each label.
2. The Return Shipment instructions, which provide your recipient with information on the returns process, will be printed with the label(s).
3. After printing, select your next step by clicking one of the displayed buttons.

**Note:** To review or print individual labels, select the Label button under each label image above.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.